Patrick R. Leverty
LEVERTY & ASSOCIATES LAW CHTD.
832 Willow Street
Reno, NV 89502
Tel. 775.322.6636
Fax. 775.322.3953
Email: pat@levertylaw.com

*Attorneys for Plaintiff*

[Additional counsel on signature block]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| PATRICK FUCHS, derivatively on behalf of RED CAT HOLDINGS, INC.,<br><br>        Plaintiff,<br><br>        vs.<br><br>JEFFREY THOMPSON, LEAH LUNGER, JOSEPH HERNON, GEORGE MATUS, GEOFFREY HITCHCOCK, BRENDAN STEWART, JOSEPH FREEDMAN, NICHOLAS LIUZZA, JR., and CHRISTOPHER R. MOE,<br><br>        Defendants,<br><br>        and<br><br>RED CAT HOLDINGS, INC.,<br><br>        Nominal Defendant. | Case No.:  2:25-cv-1473 |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Patrick Fuchs ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Red Cat Holdings, Inc. ("Red Cat" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jeffrey Thompson ("Thompson"), Leah Lunger ("Lunger"), Joseph Hernon ("Hernon"), George Matus ("Matus"), Geoffrey Hitchcock ("Hitchcock"), Brendan Stewart ("Stewart"), Joseph Freedman ("Freedman"), Nicholas Liuzza, Jr. ("Liuzza"), and Christopher R. Moe ("Moe") (collectively, the "Individual Defendants" and, together with Red Cat, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Red Cat, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Red Cat, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Red Cat's directors and officers from March 18, 2022 to January 15, 2025, both dates inclusive (the "Relevant Period").

2.     Red Cat, through its subsidiaries, offers a range of products, services, and solutions within the U.S. drone industry. These offerings include, among other things, the "Teal 2" drone, a small unmanned aircraft system ("sUAS"), that is marketed to "Dominate the Night" in nighttime military operations.

3.     Red Cat manufactures its drones through its wholly owned subsidiary, Teal Drones, Inc. ("Teal"), at a production facility located in Salt Lake City, Utah (the "Salt Lake City Facility"). Throughout 2022, the Individual Defendants publicly promoted the development of the Salt Lake City Facility, repeatedly claiming that it would have the capacity to produce "thousands of drones per month" or "tens of thousands of drones" annually.

4.     In March 2022, Red Cat announced that Teal had been selected by the U.S. Department of Defense's Defense Innovation Unit, along with the U.S. Army, to participate in Tranche 2.1 of the U.S. Army's Short Range Reconnaissance Program of Record (the "SRR Program"). The SRR Program is a U.S. Army initiative aimed at equipping Army platoons with small, rucksack-portable sUAS units.

5.     At all relevant times, the Individual Defendants represented or implied that the Tranche 2 contract under the SRR Program (the "SRR Contract") could be worth several hundred million to over one billion dollars in potential contract revenue.

6.     In March 2023, Company management further stated that "the Salt Lake City factory is complete and ready to go" and confirmed that Red Cat now had "the capacity to produce thousands of drones per month."

7.     On July 27, 2023, Red Cat held a conference call with investors and analysts to discuss its financial and operational results for fiscal year 2023 (the "FY23 Earnings Call").[1] During the FY23 Earnings Call, the Individual Defendants disclosed that the Salt Lake City Facility was only capable of producing 100 drones per month and remained

---

[1] At all relevant times, the Company's fiscal year ended on April 30, until December 31, 2024. The Board then approved changing Red Cat's fiscal year to end on December 31.

Verified Shareholder Derivative Complaint

under construction, with ongoing refinement and expansion efforts. That same day, Red Cat filed its annual report on Form 10-K with the SEC for the fiscal year 2023 (the "FY23 10-K"), which similarly stated that the facility was only "***substantially completed***"[2] and that reaching a production capacity of up to one thousand drones per month would require additional capital investment and improved manufacturing efficiencies over the next two to three years.

8.    On this news, the price of the Company's stock fell $0.10 per share, or approximately 8.93%, from a closing price of $1.12 per share on July 27, 2023, to close at $1.02 per share on July 28, 2023.

9.    On September 23, 2024, Red Cat issued a press release announcing its financial and operational results for the first quarter of fiscal year 2025 (the "1Q25 Press Release"). The 1Q25 Press Release reported a loss per share of $0.17, falling short of consensus estimates by $0.09, and revenue of $2.8 million, missing expectations by $1.07 million.

10.   Later that day, during a conference call with investors and analysts to discuss the results, the Individual Defendants disclosed that Red Cat had spent the previous four months retooling the Salt Lake City Facility in preparation for high-volume production. The Individual Defendants further admitted that a pause in manufacturing and efforts to build Army prototypes had negatively affected Teal 2 sales, acknowledging that the Company was unable to produce and sell Teal 2 units while the factory was being retooled.

11.   On this news, the price of the Company's stock fell $0.80 per share, or approximately 25.32%, over the following two trading sessions, from a closing price of $3.16 per share on September 23, 2024, to close at $2.36 per share on September 25, 2024.

12.   Making matters worse, on August 28, 2024, several of the Individual Defendants solicited shareholders to vote on various proposals in the proxy statement filed on Schedule 14A with the SEC that day, which contained materially false and misleading

---

[2] All emphasis has been added unless otherwise noted herein.

statements and omissions (the "2024 Proxy Statement"). The 2024 Proxy Statement called for shareholders to: (1) reelect Defendants Thompson, Freedman, Liuzza, Moe and elect non-party General Paul Edward Funk, II ("Funk") to the Board of Directors (the "Board"); (2) ratify the appointment of dbbmckennon as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2025; and (3) approve the 2024 Omnibus Equity Incentive Plan (the "2024 Incentive Plan"); and (4) to transact such other business as may properly come before the meeting or any adjournment or postponement thereof. The purpose of the 2024 Incentive Plan was to "attract and retain competent and dedicated individuals whose efforts will result in the long-term growth and profitability of the Company." As a result of the Individual Defendants' false and misleading statements, shareholders voted to approve the 2024 Incentive Plan, enabling the Individual Defendants and others at the Company to materially benefit therefrom. The matters omitted from the 2024 Proxy Statement and/or otherwise misrepresented were significant to investors. Had shareholders been aware of the true state at the Company, they would not have voted to approve the 2024 Incentive Plan, as it sought to (and did) reward the Individual Defendants based on false pretenses.

13.    On November 19, 2024, Red Cat issued a press release announcing that it had been awarded the SRR Contract. Later that same day, during a conference call with investors and analysts to discuss the contract award, the Individual Defendants continued to represent that the SRR Contract had the potential to generate hundreds of millions of dollars in revenue. They also expressed confidence that Red Cat could earn between $50 million and $79.5 million from the contract during fiscal year 2025 alone.

14.    The truth fully emerged on January 16, 2025, when Kerrisdale Capital ("Kerrisdale") published a report (the "Kerrisdale Report") alleging, *inter alia*, that the Individual Defendants had significantly overstated the value of the SRR Contract. According to Kerrisdale, U.S. Army budget documents indicated that the contract was worth only approximately $20 million to $25 million. The Kerrisdale Report also accused

the Individual Defendants of misleading investors for years about the true production capacity of the Salt Lake City Facility and raised concerns regarding the timing of executive departures and insider transactions that occurred shortly after Red Cat announced it had secured the SRR Contract.

15.    On this news, the price of the Company's stock fell $2.35 per share, or approximately 21.54%, over the following two trading sessions, from a closing price of $10.91 per share on January 15, 2025, to close at $8.56 per share on January 17, 2025.

16.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Red Cat, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

17.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18.    Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping combined total proceeds of approximately $25.1 million.

19.    In light of the Individual Defendants' misconduct, which has subjected Red Cat, its President/Chief Executive Officer ("CEO"), two of its former Chief Financial Officers ("CFOs"), its former Chief Technology Officer ("CTO"), its Chief Revenue Officer ("CRO"), and its Vice President of Regulatory Affairs to a federal securities fraud

class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

20.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C  § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claim also raises a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.    This derivative action is not a collusive action to confer jurisdiction on a court

of the United States that it would not otherwise have.

25.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Red Cat. Plaintiff has continuously held Red Cat common stock at all relevant times

### Nominal Defendant Red Cat

27.     Red Cat is a Nevada corporation with its principal executive offices at 15 Ave. Munoz Rivera, Ste 2200, San Juan, PR 00901. Red Cat's shares trade on The NASDAQ Stock Market, LLC ("NASDAQ") under the ticker symbol "RCAT."

### Defendant Thompson

28.     Defendant Thompson has served as the Company's CEO and President since May 15, 2019, and as a Company director since 2019.

29.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Thompson made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 2024-12-23 | 392,551 | $11.3415 | $4,452,117 |
| 2024-12-24 | 78,693 | $11.2236 | $883,219 |
| 2024-12-26 | 28,756 | $13.97 | $401,721 |

Thus, in total, before the fraud was exposed, he sold 500,000 shares of Company common stock on inside information, for which he received approximately $5,737,057 in proceeds. His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30.   The Company's proxy statement filed on Schedule 14A with the SEC on April 8, 2025 (the "2025 Proxy Statement") states the following about Defendant Thompson:

> Jeffrey Thompson has been President and Chief Executive Officer of the Company since May 15, 2019. Mr. Thompson is a Co-Founder of Unusual Machines, Inc. (NYSE American:UMAC) and continues to serve as a director since the company was incorporated in July 2019. In December 1999, Mr. Thompson founded Towerstream Corporation (Nasdaq:TWER), a fixed-wireless fiber alternative company delivering high-speed internet access to businesses, and served as its president, chief executive officer and a director from November 2005 to February 2016. In 1994, Mr. Thompson founded EdgeNet Inc., a privately held Internet service provider (which was sold to Citadel Broadcasting Corporation in 1997) and became eFortress in 1999. Mr. Thompson holds a B.S. degree from the University of Massachusetts.

> Mr. Thompson's management and public company experience and his role as President and Chief Executive Officer of the Company, led to his appointment as a director.

**Defendant Lunger**

31.   Defendant Lunger served as the Company's CFO from June 2024 to January 2025. She also previously served as the Company's Interim CFO from March 2024 to June 2024.

32.   During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lunger made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2024-12-18 | 524,798 | $9.53 | $5,001,324 |

Thus, in total, before the fraud was exposed, she sold 524,798 shares of Company common stock on inside information, for which she received approximately $5,001,324 in proceeds.

Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

33.    The 2024 Proxy Statement stated the following about Defendant Lunger:

Leah Lunger has extensive finance, accounting and public company reporting experience. Ms. Lunger has served as our Chief Financial Officer since June 2024, and previously served as the Interim Chief Financial Officer from March 2024 to June 2024. From January 2023 to March 2024, Ms. Lunger served as the Company's Vice President of Finance, providing oversight of the Company's financial, accounting and human resources functions. From November 2020 to December 2022, Ms. Lunger served as the Corporate Controller of the Company. From November 2017 to November 2020, Ms. Lunger served as the Controller of Fat Shark Holdings, a provider of equipment to the drone industry, which was subsequently acquired by the Company. Ms. Lunger is a Certified Public Accountant and has a B.S. degree in Public Accountancy and B.A. degree in French from Calvin College.

**Defendant Hernon**

34.    Defendant Hernon served as the Company's CFO from January 2010 to March 2024.

35.    The Company's proxy statement filed on Schedule 14A with the SEC on September 8, 2023 (the "2023 Proxy Statement") stated the following about Defendant Hernon:

Joseph Hernon has been Chief Financial Officer and Secretary of the Company since January 23, 2020. Mr. Hernon has extensive experience as a Chief Financial Officer over the course of his 35-year career. Mr. Hernon was a financial consultant to various private companies from May 2016 until January 2020. Prior to that, Mr. Hernon was the Chief Financial Officer for three public companies including most recently, Towerstream Corporation from May 2008 through May 2016. Previously, Mr. Hernon was employed for almost 10 years by PricewaterhouseCoopers in its audit practice and was a Senior Business Assurance Manager during his last five years with the firm. Mr. Hernon is a certified public accountant, but not presently licensed to practice, and earned a Master's degree in Accountancy from Bentley University in 1986.

**Defendant Matus**

36.    Defendant Matus served as the Company's CTO from November 2023 until December 2024. Defendant Matus is also the founder of Teal and served as its CEO until December 2024.

37.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Matus made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2024-12-18 | 112,686 | $9.20 | $1,036,711 |
| 2024-12-20 | 287,113 | $9.94 | $2,853,903 |
| 2024-12-24 | 72,093 | $12.10 | $872,325 |
| 2024-12-26 | 219,369 | $14.10 | $3,093,103 |
| 2024-12-26 | 90,123 | $14.67 | $1,322,104 |

Thus, in total, before the fraud was exposed, he sold 781,384 shares of Company common stock on inside information, for which he received approximately $9,178,146 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.    The 2024 Proxy Statement stated the following about Defendant Matus:

George Matus has served as our Chief Technology Officer since November 2023. Mr. Matus is a technologist and entrepreneur who founded Teal Drones, Inc. in 2015. After developing novel technologies on his own in high school, including thrust vectoring multi-rotors, modular and extensible airframes, and record endurance platforms, he founded the company with a vision of the future of drones. Since Teal's inception in 2015, Mr. Matus has raised several rounds of venture capital financing, defined the company's product roadmap, launched four products to market through American manufacturing, and continues to lead the company after its acquisition by Red Cat Holdings. George is a Peter Thiel Fellow, Forbes 30 Under 30 member, was recognized

by TIME magazine as one of the 30 most influential teens in America, and holds over a dozen granted patents.

**Defendant Hitchcock**

39.    Defendant Hitchcock has served as the Company's CRO since November 2024. Before this, Defendant Hitchcock served as the Company's Senior Vice President of Global Defense Solutions from September 2021 to December 2024. He also served as Teal's General Manager from March 2024 to November 2024.

40.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hitchcock made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2024-12-20 | 82,137 | $10.14 | $832,869 |
| 2024-12-20 | 31,686 | $11.22 | $354,883 |

Thus, in total, before the fraud was exposed, he sold 113,823 shares of Company common stock on inside information, for which he received approximately $1,187,752 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

41.    The 2025 Proxy Statement stated the following about Defendant Hitchcock:

Geoffrey Hitchcock has served as the General Manager of our subsidiary Teal Drones, Inc. since March of 2024. Previously, since September of 2021, he has served as the Senior Vice President for Global Defense Solutions at Red Cat Holdings, Inc. Prior to joining Red Cat, Mr. Hitchcock served as Vice President for Sales and Business Development at Vantage Robotics, a supplier of military and commercial UAVs and UAV equipment, from April of 2021 through August of 2021. At Vantage Robotics, he was responsible for establishing U.S. government and international business relationships with a focus on penetrating new market segments to support sales growth. From April of 2017 to April of 2021, Mr. Hitchcock was Director of International Business Development at AeroVironment, a leading manufacturer of

uncrewed aircraft systems, unmanned aerial vehicles, and loitering munition systems. From October of 2004 to April of 2017, he was Director of Flight Operations at AeroVironment. Prior to entering the private sector, Mr. Hitchcock served for twenty-two years in the U.S. Air Force, where he served as the UAV Subject Matter Expert for the Air Force Special Operations Command from January of 2003 to October of 2004. His earlier roles in the Air Force included serving as the Operations Superintendent for the 720th Special Tactics Group, the Operations Superintendent for the 21 st Special Tactics Squadron, and as part of the 24th Special Tactics Squadron of the Joint Special Operations Command. Mr. Hitchcock holds a B.S. in Aeronautics from Embry Riddle Aeronautical University and an Associate degree in Airway Science from the Community College of the Air Force.

**Defendant Stewart**

42.    Defendant Stewart has served as the Company's Vice President of Regulatory Affairs since October 2021. He recently began his role as Senior Vice President of Regulatory and Government Affairs in June 2025.

43.    The Company's website, on a page entitled "Leadership," stated the following about Defendant Stewart:

> Brendan Stewart is an experienced aviation compliance professional with extensive experience helping organizations and end users reap the benefits of unmanned systems. Brendan was responsible for receiving the 4th ever approved 107.39 waiver allowing his clients to successfully operate a UAS over people as early as 2017, and the first Part 107 waiver to allow localized urban drone delivery operations. Brendan specializes in aircrew training, human factors mitigation, and failure analysis. He regularly shares his expertise at national conferences speaking on UAS operations, training, and safety.[3]

**Defendant Freedman**

44.    Defendant Freedman has served as a Company director since January 2021. He also serves as the Lead Independent Director, Chairman of the Board, and as a member of the Nominating and Governance Committee and Audit Committee.

_____

[3] https://redcat.red/company/leadership/

45.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Freedman made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 2024-12-20 | 50,000 | $10.00 | $500,000 |

Thus, in total, before the fraud was exposed, he sold 50,000 shares of Company common stock on inside information, for which he received approximately $500,000 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

46.    The 2025 Proxy Statement stated the following about Defendant Freedman:

Joe Freedman is a seasoned entrepreneur with a proven track record of launching, scaling, and successfully exiting businesses across executive search, title insurance, legal services, and hospitality. His career spans turnarounds, mergers and acquisitions, and the strategic wind-down and asset liquidation of an underperforming company. Prior to selling three companies to NYSE-listed, private equity, and privately held acquirers, Mr. Freedman led them to industry leadership. Five of his companies earned a spot on the Inc. 500/5000 list a combined 15 times, including one ranked in the top 100. He currently serves as a Director at Red Cat Holdings, Inc. (Nasdaq: RCAT), and in 2023 joined the board of Beeline Financial, Inc., a digital home lending and title platform designed to streamline the financing process. In 2006, Mr. Freedman co-founded Peachtree Tents & Events Holdings, where he served as CEO until 2021 and its sale in 2023. He previously co-founded and led RFx Legal, LLC, Richmond Title, LLC, and AMICUS Legal Staffing, Inc., guiding all three through successful exits.

Beyond his entrepreneurial ventures, Mr. Freedman is an active civic leader. He has served in multiple roles—including President—on the board of the Entrepreneurs' Organization (EO) Nashville Chapter, and currently serves as its Governance Chair. In 2022, he founded Drones For Good Worldwide, a nonprofit dedicated to delivering drones for humanitarian use in disaster zones around the globe.

Mr. Freedman holds a B.S. in Finance from Louisiana State University and a Juris Doctor from Northwestern California University School of Law. He is also NACD Certified by the National Association of Corporate Directors. His experience in governance, executive recruiting, finance, and operational leadership provided the basis upon which the Company appointed him to the Board.

**Defendant Liuzza**

47.    Defendant Liuzza has served as a Company director since June 2019. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee.

48.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Liuzza made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 2024-12-23 | 200,000 | $10.80 | $2,160,000 |
| 2024-12-26 | 20,000 | $13.92 | $278,400 |
| 2024-12-30 | 80,000 | $13.46 | $1,076,800 |

Thus, in total, before the fraud was exposed, he sold 300,000 shares of Company common stock on inside information, for which he received approximately $3,515,200 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

49.    The 2025 Proxy Statement stated the following about Defendant Liuzza:

Nicholas Liuzza Jr. has been a director of the Company since June 1, 2019. Mr. Liuzza is the Co-Founder and Chief Executive Officer of Beeline Loans (Nasdaq: BLNE), a digital home lending and title platform designed to streamline the financing process. Previously, Mr Liuzza founded Linear Title & Closing, Ltd, a highly automated, and one of the largest, private national title agencies in the U.S in 2005. In 2012, he founded Nexgen Mortgage Services. Both companies merged with Real Matters and went public on the Toronto Stock Exchange (TSX) in 2018 at a $1 billion valuation. Nick served

as Executive Vice President of Real Matters, Inc. and exited in 2020 to work for Beeline Loans. Mr. Liuzza founded New Age Nurses, a healthcare staffing company which he grew into a national provider of healthcare personnel services which became the platform for a reverse merger which listed on the OTC upon its acquisition in 2003 by Crdentia. Prior thereto, Mr. Liuzza was Executive Vice President of AMICUS Legal Staffing, a national staffing services provider with a specialization in real estate transactions. Mr. Liuzza started his career with Xerox Corporation in 1988. Mr. Liuzza's more than 20 years of experience as an entrepreneur in the software industry and his sales and software development experience led to his appointment as a director.

**Defendant Moe**

50.    Defendant Moe has served as a Company director since February 2022. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Governance Committee. The Board determined that Defendant Moe is qualified as an Audit Committee Financial Expert pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

51.    The 2025 Proxy Statement stated the following about Defendant Moe:

Christopher R. Moe has been a director of the Company since February 2022. He is the Chief Financial Officer of Beeline Holdings, Inc. (Nasdaq: BLNE), a digital home loan lending and title platform designed to streamline the financing process. Previously, he was the Chief Financial Officer and Director of Yates Electrospace Corporation, a heavy payload autonomous cargo delivery UAS producer. Earlier, he was the Chairman, Chief Executive Officer, and co-founder of ProBrass Inc., a rifle brass cartridge case manufacturing company that Vairog US acquired. Previously, he was the Chief Financial Officer of Vectrix Holdings Limited, a subsidiary of GP Industries Ltd (G20:SGX), an international developer and manufacturer of electric motorcycles, and the Chief Financial Officer and Director of Mission Motor Company, a company focused on advanced EV and hybrid powertrains for automobile and power sports applications. He has served as the Chief Financial Officer and Director of Vectrix Corporation (LSE: VRX), Managing Director of GH Ventures, Managing Director of Kirkland-Ft. Worth Investment Partners, Chief Executive Officer of St. Louis Ship Industries, Vice President of Wasserstein, Perella & Co.'s merchant banking fund, and Vice President/Area Head with Citicorp's Leveraged Capital Group. He serves on the Advisory Board of Innovate Newport and is Trustee Emeritus

of The Pennfield School. He is the former Vice Chairman of the Choir School of Newport County and former Treasurer of the Zabriskie Memorial Church of Saint John the Evangelist. He served as a Captain of United States Marines and deployed with the 31st Marine Expeditionary Unit twice to the Western Pacific and Indian Ocean. He holds a BA degree in English from Brown University and an MBA from the Harvard Business School.

Mr. Moe's experience in operational finance, and with venture capital, private equity, M&A, and corporate finance transactions, both as agent and principal, with a focus on transportation, provide the basis upon which the Company appointed him to the Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Red Cat and because of their ability to control the business and corporate affairs of Red Cat, the Individual Defendants owed Red Cat and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Red Cat in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Red Cat and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to Red Cat and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Red Cat, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of Red Cat were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his, her, or its position as a director

and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Red Cat, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Red Cat's Board at all relevant times.

57.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.    To discharge their duties, the officers and directors of Red Cat were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Red Cat were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Nevada and the United States, and pursuant to Red Cat's own Corporate Code of Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Red Cat conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Red Cat and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Red Cat's operations would comply with all applicable laws and Red Cat's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.    Each of the Individual Defendants further owed to Red Cat and the shareholders the duty of loyalty requiring that each favor Red Cat's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

60.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Red Cat and were at all times acting within the course and scope of such agency.

61.    Because of their advisory, executive, managerial, and directorial positions with Red Cat, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Red Cat.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

65.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Red Cat was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Red Cat and was at all times acting within the course and scope of such agency.

## RED CAT'S CODE OF CONDUCT

68.    The Company's Code of Conduct states that it is intended to "provide our associates . . . with a clear understanding of the principles of business conduct and ethics that are expected of them." The Code of Conduct defines an associate as "every full and part-time employee of the Company and its subsidiaries, all members of the Company's senior management, including the Company's [CEO] and [CFO], and every member of the Company's Board of Directors."

69.    The Code of Conduct, under the heading "General Requirements," states the

following, in relevant part:

> To be honest, fair, and accountable in all business dealings and obligations, and to ensure:
>
> - the ethical handling of conflicts of interest between personal and professional relationships;
>
> - full, fair, accurate, timely and understandable disclosure in the reports required to be filed by the Company with the Securities and Exchange Commission and in other public communications made by the Company; and
>
> - compliance with applicable governmental laws, rules and regulations.

70.     Under the section titled "Protection and Proper Use of Company Assets," in the subsection "Accurate Records and Reporting," the Code of Conduct states, in relevant part:

> Under law, the Company is required to keep books, records and accounts that accurately and fairly reflect all transactions, disposition of assets and other events that are the subject of specific regulatory record keeping requirements, including safety and inspection reports, routing and scheduling information, generally accepted accounting principles and other applicable rules, regulations and criteria for preparing financial statements. All Company financial reports, accounting records, sales reports, expense accounts, invoices, purchase orders, and other documents must accurately and clearly represent the relevant facts and the true nature of transactions. Under no circumstance may there be any unrecorded liability or fund of the Company, regardless of the purposes for which the liability or fund may have been intended, or any improper or inaccurate entry knowingly made on the books or records of the Company. No payment on behalf of the Company may be approved or made with the intention, understanding or awareness that any part of the payment is to be used for any purpose other than that described by the documentation supporting the payments. In addition, intentional accounting misclassifications (e.g., expense versus capital) and improper acceleration or deferrals of expenses or revenues are unacceptable reporting practices that are expressly prohibited.
>
> The Company has developed and maintains a system of internal controls to provide reasonable assurance that transactions are executed in accordance

with management's authorization, are properly recorded and posted, and is in compliance with regulatory requirements. The system of internal controls within the Company includes written policies and procedures, budgetary controls, supervisory review and monitoring, and various other checks and balances, and safeguards such as password protection to access certain computer systems. Associates are expected to be familiar with, and to adhere strictly to, these control policies.

The Company has also developed and maintains a set of disclosure controls and procedures to ensure that all of the information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms.

Associates are expected to be familiar with, and to adhere strictly to, these internal controls and disclosure controls and procedures.

Responsibility for compliance with these principles rests with all associates, and not solely with the Company's accounting personnel. All associates involved in approving transactions, supplying documentation for transactions, and determining account classifications are responsible for complying with these standards. Because the integrity of the Company's external reports to shareholders and the Securities and Exchange Commission depends on the integrity of the Company's internal reports and record-keeping, all associates must adhere to the highest standards of care with respect to our internal records and reporting. The Company is committed to full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by it with the SEC, and it expects each associate to work diligently towards that goal. All associates shall, as requested, assist the Company's Disclosure Committee in gathering, analyzing and summarizing relevant information for such periodic reports.

71.    In the same section, under a subsection entitled "Records Management," the Code of Conduct states, in relevant part:

The Company requires honest and accurate recording and reporting of information in order to make reasonable business decisions. All Company business data, records and reports must be prepared truthfully and accurately. Numerous federal and state statutes require the proper retention of many categories of records and documents that are commonly maintained by companies. All of the Company's books, records, accounts and financial

statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and conform to the applicable legal requirements and the Company's system of internal controls for retention and destruction.

72.    Under the section "Compliance with Laws, Rules and Regulations," in the subsection "Insider Trading Policy," the Code of Conduct states, in relevant part:

The Company expressly forbids any associate from trading in the Company's stock, or the stock of others, based on material non-public information or communicating material non-public information to others in violation of the law. This conduct is frequently referred to as "insider trading." This policy applies to every associate of the Company and extends to activities both within and outside their duties to the Company, including trading for a personal account.

The concept of who is an "insider" is broad. It includes officers, directors and employees of a Company. In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a Company's affairs and as a result is given access to information solely for the Company's purpose. A temporary insider can include, among others, a Company's investment advisors, agents, attorneys, accountants and lending institutions, as well as the employees of such organizations. The Company may become a temporary insider of another Company with which it has a contractual relationship, to which it has made a loan, to which it provides advice or for which it performs other services.

Trading on inside information is not a basis for liability unless the information is material. This is information that a reasonable investor would consider important in making his or her investment decisions, or information that is likely to have a significant effect on the price of a Company's securities.

Information is non-public until it has been effectively communicated to the marketplace. Tangible evidence of such dissemination is the best indication that the information is public. For example, information found in a report filed with the Securities and Exchange Commission or appearing in a national newspaper would be considered public.

Each associate should be familiar with and abide by the Statement of Policy on Securities Trading. A copy of this policy is given to, and signed by, all new associates of the Company and is available from the Human Resources Department.

73.    In the section "Reporting Violations Under the Code; Non-Retaliation Policy," the Code of Conduct states, in relevant part:

> Any associate of the Company having any information or knowledge regarding the existence of any violation or suspected violation of the Code has a duty to report the violation or suspected violation to any member of the Committee or the Board of Directors. Additionally, any associate may report, on a confidential and anonymous basis, any concerns regarding questionable accounting or auditing matters in accordance with the procedures set forth in Section III.C above.

74.    In the section, "Questions Under the Code and Waiver Procedures," the Code of Conduct states:

> Associates are encouraged to consult with any member of the Committee about any uncertainty or questions they may have under the Code.
>
> If any situation should arise where a course of action would likely result in a violation of the Code but for which the associate thinks that a valid reason for the course of action exists, the associate should contact a member of the Committee to obtain a waiver prior to the time the action is taken. No waivers will be granted after the fact for actions already taken.
>
> The Committee will review all the facts surrounding the proposed course of action and will make a recommendation to the independent members of the Board of Directors as to whether a waiver from any policy in the Code should be granted. If a majority of the independent directors on the Board of Directors agree that a waiver should be granted, it will be granted in writing and signed by two Executive Officers, one of which must be the Chairman of the Board (or in his absence an independent Board member). All waiver grants will be disclosed to the executive officers and to the directors. If the waiver is granted for actions to be taken by or for the benefit of an executive officer or member of the Board of Directors, the Company will disclose the nature and reasons for the waiver in a current report on Form 8-K to be filed with the SEC. If a majority of the independent directors deny the request for a waiver, the waiver will not be granted and the associate may not pursue the intended course of action.
>
> It is the Company's policy only to grant waivers from the Code in limited and compelling circumstances.

75.    In violation of the Code of Conduct, the Individual Defendants, as key officers and as members of the Company's Board, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## RED CAT'S AUDIT COMMITTEE CHARTER

76.    Red Cat's Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter") outlines the purpose, composition, and responsibilities of the Company's Audit Committee.

77.    Per the Audit Committee Charter, the Audit Committee's purpose is defined as follows:

> The Committee has been established to: (a) represent and assist the Board in its oversight responsibilities regarding the Company's accounting and financial reporting processes, the audits of the Company's financial statements, including the integrity of the financial statements, and the independent auditors' qualifications and independence; (b) oversee the preparation of the report required by Securities and Exchange Commission ("SEC") rules for inclusion in the Company's annual proxy statement; (c) retain and terminate the Company's independent auditors; (d) approve in advance all audit and permissible non-audit services to be performed by the independent auditors; (e) approve related person transactions; and (f) perform such other functions as the Board may from time to time assign to the Committee.

78.    Under the section, "Committee Responsibilities," in the subsection entitled, "Review of Documents and Reports," the Audit Committee Charter states:

> 1. Review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements (including disclosures under the section entitled Management's

Discussion and Analysis of Financial Condition and Results of Operations and any report by the independent auditors related to the financial statements. Based on the review, the

2. Committee shall make its recommendation to the Board as to the inclusion of the Company's audited consolidated financial statements in the Company's annual report on Form 10-K.

3. Review and discuss earnings press releases with management and the independent auditors.

4. Oversee the preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

79.     Under the same section, in the subsection "Independent Auditor Matters," the Audit Committee Charter states, in relevant part, that the Audit Committee shall: "Approve, in advance, all audit and permissible non-audit services to be provided by the independent auditors, and establish policies and procedures for the preapproval of audit and permissible non-audit services to be provided by the independent auditors."

80.     Under the same section, in the subsection "Internal Controls and Disclosure Controls," the Audit Committee Charter states:

1. Review and discuss the adequacy and effectiveness of the Company's internal controls, including periodically receiving reports from the Company's independent auditors and Chief Executive Officer and Chief Financial Officer regarding the Company's system of internal controls.

2. Review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures, including periodically receiving reports from management regarding the Company's disclosure controls and procedures.

3. Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

81.   Under the same section, in the subsection "Other Responsibilities," the Audit Committee Charter states, in relevant part:

1.   Review and discuss the Company's practices with respect to risk assessment and risk
  management

2.   Annually evaluate the adequacy of the Committee's charter.

82.   In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.   Red Cat, along with its subsidiaries, offers a range of products, services, and solutions to support the U.S. drone industry.

84.   On August 31, 2021, Red Cat acquired Teal, the manufacturer of the Golden Eagle drone, one of only five drones at the time approved by the U.S. Department of Defense for use in reconnaissance, public safety, and inspection missions.

85.   After acquiring Teal, Red Cat went on to develop and launch the Teal 2 drone, a sUAS designed specifically to "Dominate the Night" in nighttime military

operations. These drones are manufactured in the Salt Lake City Facility.

86.    On March 14, 2022, Red Cat announced that the U.S. Department of Defense's Defense Innovation Unit and the U.S. Army had chosen Teal to participate in Tranche 2 of the U.S. Army's SRR Program. This program aims to supply small, rucksack-portable sUAS to U.S. Army platoons.

87.    Throughout the Relevant Period, the Individual Defendants implied or otherwise claimed that the SRR contract could generate contract revenues ranging from hundreds of millions to over a billion dollars.

**False and Misleading Statements**

***March 17, 2022 3Q22 Earnings Call***

88.    The Relevant Period began on March 18, 2022, just one day after the Company hosted an earnings call with analysts and investors to discuss its financial results for the third quarter of its 2022 fiscal year (the "3Q22 Earnings Call"). During the 3Q22 Earnings Call, Defendant Hernon stated the following, in relevant part:

> During the quarter, we doubled the size of the Teal facilities, both to increase its manufacturing output capabilities as well as to house its workforce . . . . [W]e have been making a lot of capital investments in Teal both in its facilities and its people to take advantage of what we see as significant commercial opportunities for the Golden Eagle.

89.    On the same 3Q22 Earnings Call, Defendant Thompson represented the following, in relevant part:

> [W]e are poised to grow like crazy. ***The plant is ready to go*** . . . . We are keeping our heads down and getting our manufacturing capability to be able to put out ***thousands of drones a month*** . . . . [T]hat's our focus, and everyone is doing a great job on it.

***July 27, 2022 FY22 Earnings Call and FY22 10-K***

90.    On July 22, 2022, the Company hosted an earnings call with investors and analysts to discuss its financial results for the fiscal year ended April 30, 2022 (the "FY22 Earnings Call"). During the FY22 Earnings Call, Defendant Thompson stated

that "[t]he Teal Drone production line is in ***full swing***," that the Company "expect[s] to go into mass production ***in the fall***," and the SRR Program's Tranche 2 "is for tens of thousands of drones and ***hundreds of millions of dollars' worth of revenue***."

91.    That same day, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended April 30, 2022 (the "FY22 10-K"), which was signed by Defendants Thompson, Hernon, Liuzza, Moe, and Freedman. The FY22 10-K stated that Teal had "doubled the size of [the Salt Lake City Facility] in order to ***fully scale*** production capacity to meet the forecasted growth in demand."

92.    Attached as exhibits to the FY22 10-K were SOX certifications, in which Defendants Thompson and Hernon affirmed, in relevant part, that the FY22 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

### September 12, 2022 1Q23 Earnings Call

93.    On September 12, 2022, the Company held an earnings call with analysts and investors to discuss its financial results for the first quarter of its fiscal year 2023 (the "1Q23 Earnings Call"). On the 1Q23 Earnings Call, while discussing the Salt Lake City Facility's production capacity, Defendant Thompson stated, in relevant part:

> ***We are currently switching from . . . production validation tests to ramp in mass production*** . . . . If we win Tranche 2, we will be capable of basically hitting the ground running and produced [*sic*] this drone as quickly as possible . . . . ***[N]ow we basically fix any issues and problems and vendors and tooling*** that we want to do to automate production line so that we can really scale it . . . . ***We hope to have the construction done in the next month or two and put this behind us and that will also bring us into full mass production.***

### November 29, 2022 Business Update Call

94.    On November 29, 2022, the Company held a conference call with investors and analysts to deliver a business update, during which Defendant Thompson

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

made the following relevant statements:

> We are about to start being able to ship over the next four to six weeks, the brand new bird that we've been working on . . . . ***So the factory is going to be basically in full swing.*** It's starting now and we'll be able to produce ***thousands of drones per month*** . . . . We have the inventory, we have the parts, we have the capital . . . . So the factory is doing awesome.

### December 15, 2022 2Q23 Press Release and Earnings Call

95.    On December 15, 2022, the Company announced its financial results for the second quarter of its fiscal year 2023 in a press release (the "2Q23 Press Release"). In the 2Q23 Press Release, the Company represented that "[e]xpansion of [the] manufacturing facility at Teal ***[is] expected to be completed in [the] fourth quarter of fiscal year 2023*** and will double production capacity."

96.    Also, in the 2Q23 Press Release, a quote from Defendant Thompson stated that "the production line from our new U.S. factory in Salt Lake City . . . ***has the capacity to build thousands of drones***." The 2Q23 Press Release also stated that "***the U.S. Army's [SRR] program continues to expand in scope and value***."

97.    That same day, the Company hosted an earnings call with analysts and investors to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"). On the 2Q23 Earnings Call, Defendant Thompson stated that the "new factory in Salt Lake City [] can produce ***tens of thousands of drones per year.***"

### March 7, 2023 3Q23 Earnings Call

98.    On March 7, 2023, the Company hosted a conference call with analysts and investors to discuss its financial results for the third quarter of its fiscal year 2023. During the call, Defendant Thompson stated, *inter alia*, that: "***[t]he Salt Lake City factory is complete and ready to go***" and "***[w]e now have the capacity to produce thousands of drones per month***."

### <u>The Truth Begins to Emerge as False and Misleading Statements Continue</u>

### July 27, 2023 FY23 Earnings Call and 10-K

99.    On July 27, 2023, the Company hosted its FY23 Earnings Call with analysts and investors for the fiscal year ended April 30, 2023. On the FY23 Earnings Call, the Individual Defendants disclosed that the Salt Lake City Facility was presently capable of producing only 100 drones per month and remained under construction, refinement, and expansion. Specifically, Defendant Hernon stated that Teal's operations personnel were "focused on building, refining, and expanding our production capacity, which is ***presently at 100 systems per month***," and that the Individual Defendants "***believe*** [they] can more than triple [this capacity] over the next ***few years***."

100.    Also on the FY23 Earnings Call, during the question-and-answer portion of the call, investors questioned the apparent discrepancy between the current production rate and previous projections, seeking clarification on future production capacity, to which Defendant Thompson responded the following, in relevant part:

> [F]irst you just got to get the factory up and running and make sure that you have all the issues out of the production line to reliably do 100 a month, as some of our team says, we do 100 a month, no problem a tease right now. And that number is already growing slightly. ***But you don't go off and build 1,000 drones***, because there's different frequencies . . . . ***And so you can't just make . . . batches and hope for the best of 1,000 and then ship them out.***

101.    Responding to the same prompt, Defendant Hernon said, "***I don't personally recall us ever saying we could produce 1,000 a month***."

102.    That same day, the Company filed its FY23 10-K for the fiscal year ended April 30, 2023, which was signed by Defendants Thompson, Hernon, Liuzza, Moe, and Freedman. The FY23 10-K report stated that construction of the Salt Lake City facility was only "***substantially completed***," confirmed that its current "***production capacity was approximately 100 drones per month***," and noted that the facility's maximum production capacity could reach 1,000 drones per month "over the next ***2 to 3 years. Provided that additional capital investments are made and manufacturing***

*efficiencies realized*."

103.    Attached as exhibits to the FY23 10-K were SOX certifications, in which Defendants Thompson and Hernon affirmed, in relevant part, that the FY22 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.    On this news, the price of the Company's stock fell $0.10 per share, or approximately 8.93%, from a closing price of $1.12 per share on July 27, 2023, to close at $1.02 per share on July 28, 2023. Despite the drop in the Company's stock price, Red Cat securities continued to trade at artificially inflated levels for the remainder of the Relevant Period due to the Individual Defendants' ongoing misrepresentations and omissions regarding the production capacity of the Salt Lake City Facility, the progress in its development, and the overall value of the SRR Contract. Indeed, later on the FY23 Earnings Call, Defendant Thompson indicated that the value of the SRR Contract could potentially exceed one billion dollars. He stated that, although "[w]e still do not know the size of the award for the now combined Tranche 2 and 3" of the SRR Program, "the information we do have" shows that "Tranche 1 production award was for $100 million for approximately 1,000 drones" and that "Tranche 2 and 3 is for approximately 12,000 drones."

### September 8, 2023 Proxy Statement

105.    On September 8, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Thompson, Freedman, Liuzza, and Moe solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

106.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Thompson, Freedman, Liuzza, and Moe to the

Board; (2) ratify the appointment of BF Borgers, CPA, PC ("BF Borgers") as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2024; and (3) approve an amendment to the Company's 2019 Equity Incentive Stock Plan (the "Amendment") to increase to number of shares available for issuance thereunder by 3,000,000.

107.   The 2023 Proxy Statement explained that the Amendment would increase the aggregate number of shares authorized for issuance under the existing plan by 3,000,000 shares. As such, upon approval of the Amendment, the maximum number of shares of common stock that could be issued under the plan would be 11,750,000 shares. The 2023 Proxy Statement noted that if the Red Cat shareholders approved the Amendment, "all employees, consultants and directors of the Company and its affiliates and such other individuals designated by the Board or committee administering the plan who [we]re reasonably expected to become employees, consultants and directors [we]re eligible to participate." Further the Amendment awards "Incentive Stock Option ("ISOs"), Non-Qualified Stock Options, Stock Appreciation Rights ("SARs"), restricted stock, or restricted stock units [] to Eligible Parties, who, in the opinion of the Administrator, have contributed, or are expected to contribute, materially to the Company's success."

108.   Regarding "Board Risk Oversight," the 2023 Proxy Statement stated the following:

> The Company's risk management function is overseen by the Board. The Company's management keeps the Board apprised of material risks and provides the directors with access to all information necessary for them to understand and evaluate how these risks interrelate, how they affect us, and how management addresses those risks. Jeffrey Thompson, Chairman of the Board, works closely together with the other members of the Board when material risks are identified on how to best address such risks. If the identified risk poses an actual or potential conflict with management, the Company's independent directors may conduct the assessment. Presently, the primary risk affecting us is that we have never been profitable and we

have limited financial resources to support our operations.

109.  Regarding the Code of Conduct, the 2023 Proxy Statement stated:

The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that applies to all of the Company's employees, including the Company's Chief Executive Officer and Chief Financial Officer. Although not required, the Code of Ethics also applies to the Company's directors and its Chief Operating Officer. The Code of Ethics provides written standards that we believe are reasonably designed to deter wrongdoing and promote honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely and understandable disclosure and compliance with laws, rules and regulations, (iii) the prompt reporting of illegal or unethical behavior, and (iv) accountability for adherence to the Code of Ethics.

110.  Defendants Thompson, Freedman, Liuzza, and Moe caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

111.  The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

112.  As a result of Defendants Thompson, Freedman, Liuzza, and Moe causing the 2023 Proxy Statement to be misleading, shareholders voted, *inter alia*, to: (1) re-elect Defendants Thompson, Freedman, Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify

the appointment of BF Borgers as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2024; and (3) approve the Amendment to increase the number of shares available for issuance under the 2019 Plan by 3,000,000.

### March 18, 2024 3Q24 Earnings Call

113.   On March 18, 2024, the Company held an earnings call with analysts and investors to discuss its financial results for the third fiscal quarter ended January 31, 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Thompson represented that the SRR contract "is for approximately 12,000 drones. The award for first tranche of production drones two year ago, was $100 million for 1,083 drones."

114.   On the same 3Q24 Earnings Call, Defendant Thompson stated, regarding the Salt Lake City Facility's production capacity: "Production facility in Salt Lake City *is in full mass production mode . . . We are now demonstrating that we can build tens of thousands of drones yearly*."

### August 8, 2024 FY24 10-K

115.   On August 8, 2024, the Company filed its annual Form 10-K with the SEC for the fiscal year ended April 30, 2024 (the "FY24 10-K), which was signed by Defendants Thompson, Lunger, Liuzza, Moe, and Freedman. The FY24 10-K stated that throughout the 2024 fiscal year, "Teal continued to scale the [Salt Lake City Facility], including dedicated teams for production and assembly, manufacturing engineering, supply chain and logistics, warranty and returns, as well as a flight operations team that is focused on manufacturing and quality assurance and quality control."

116.   Attached as exhibits to the FY24 10-K were SOX certifications, in which Defendants Thompson and Lunger affirmed, in relevant part, that the FY24 10-K "does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

### *August 28, 2024 Proxy Statement*

117.  On August 28, 2024, the Company filed its 2024 Proxy Statement with the SEC. Defendants Thompson, Freedman, Liuzza, and Moe, *inter alia*, solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

118.  The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) reelect Defendants Thompson, Freedman, Liuzza, Moe, and elect non-party Funk, to the Board; (2) ratify the appointment of dbbmckennon as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2025; and (3) approve the 2024 Incentive Plan.

119.  The 2024 Proxy Statement noted that, on August 21, 2024, if approved by shareholders, the 2024 Incentive Plan would become effective, and all awards under the amended 2019 Plan that were outstanding as of that date would continue to be outstanding under the 2024 Incentive Plan. Under the 2024 Incentive Plan, the 2024 Proxy Statement stated that 11,250,000 shares of common stock would initially be available for grant. Further, the 2024 Incentive Plan provided for the awarding of "options, share appreciation rights, restricted shares, restricted share units and other share-based awards to [Company] employees, directors and independent contractors."

120.  The purpose of the 2024 Incentive Plan was purportedly to "attract and retain competent and dedicated individuals whose efforts [would] result in the long-term growth and profitability of the Company."

121.  Pursuant to the 2024 Incentive Plan, awards may be granted until the tenth anniversary of the 2024 Incentive Plan's effective date, which is August 21, 2034.

122.  Regarding "Board Risk Oversight," the 2024 Proxy Statement stated:

The Company's risk management function is overseen by the Board. The Company's management keeps the Board apprised of material risks and provides the directors with access to all information necessary for them to understand and evaluate how these risks interrelate, how they affect us, and how management addresses those risks. Jeffrey Thompson, Chairman of the Board, works closely together with the other members of the Board when material risks are identified on how to best address such risks. If the identified risk poses an actual or potential conflict with management, the Company's independent directors may conduct the assessment. Presently, the primary risk affecting us is that we have never been profitable and we have limited financial resources to support our operations.

123.    Regarding the Company's Code of Conduct, the 2024 Proxy Statement stated:

The Board has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that applies to all of the Company's employees, including the Company's Chief Executive Officer and Chief Financial Officer. Although not required, the Code of Ethics also applies to the Company's directors and its Chief Technology Officer. The Code of Ethics provides written standards that we believe are reasonably designed to deter wrongdoing and promote honest and ethical conduct, including (i) the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely and understandable disclosure and compliance with laws, rules and regulations, (iii) the prompt reporting of illegal or unethical behavior, and (iv) accountability for adherence to the Code of Ethics.

124.    Defendants Thompson, Freedman, Liuzza, and Moe caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

125.    The 2024 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers

or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

126.    As a result of Defendants Thompson, Freedman, Liuzza, and Moe causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Thompson, Freedman, Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of dbbmckennon as the Company's independent registered public accounting firm for the fiscal year ended April 30, 2025; and (3) approve the 2024 Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future. As a result of the shareholders approving the 2024 Incentive Plan, an additional 11,250,000 shares were made initially available for disbursement.

### September 23, 2024 1Q25 Press Release and Earnings Call

127.    On September 23, 2024, the Company issued a press release reporting its financial results for the first quarter of its fiscal year 2025 (the "1Q25 Press Release"). Among other adverse financial results, the Company reported a loss of $0.17 per share, which fell short of consensus estimates by $0.09. Additionally, the Company reported revenue of $2.8 million, missing analyst expectations by approximately $1.07 million.

128.    That same day, the Company held an earnings call with analysts and investors to discuss its financial and operational results for the first quarter 2025 (the "1Q25 Earnings Call"). On the 1Q25 Earnings Call, Defendant Thompson revealed that, contrary to his earlier representations that the Salt Lake City Facility was "in full mass production mode" and capable of "build[ing] tens of thousands of drones yearly," Red Cat had, in fact, spent "the past four months . . . retooling and preparing for high volume production." In discussing the Company's sales performance for the quarter, Defendant Thompson further acknowledged that a "pause in manufacturing of Teal 2

and building our Army prototypes impacted Teal 2 sales," explaining that Red Cat "couldn't produce and sell Teal 2 units[] while retooling [its] factory."

129.   On this news, the price of the Company's stock fell $0.80 per share, or approximately 25.32%, over the following two trading sessions, from a closing price of $3.16 per share on September 23, 2024, to close at $2.36 per share on September 25, 2024. Despite this, the Individual Defendants continued to make false and misleading statements to investors regarding, *inter alia*, the Company's production capabilities.

### *November 19, 2024 SRR Contract Press Release and Conference Call*

130.   On November 19, 2024, the Company issued a press release announcing that it had won the SRR contract (the "SRR Contract Press Release"). The SRR Contract Press Release stated that the Company acquired the contract "to meet the Army's current stated acquisition objective for 5,880 systems, which is subject to change over the 5 year period of performance."

131.   That same day, the Company held a conference call with investors and analysts to discuss, *inter alia*, the new SRR contract (the "SRR Contract Conference Call"). During the SRR Contract Conference Call, Defendant Matus stated, among other things, that total revenue under the SRR Contract could potentially exceed $260 million, noting:

> *[T]he average price per system . . . includes [sic] two drones and one controller is around $45,000, depending on configuration. And the Army's stated authorized acquisition objective or AAO, is 5,880 systems . . . . [Y]ou can do some simple math on those numbers. And we also expect the Army to buy spare parts, training and maintenance in addition to systems themselves.* I think it's also worth noting that the Army's acquisition objective number was created before the invasion of Ukraine and before the world realized that drones are really as impactful as the introduction of the machine gun, a 100 years ago. *In my opinion, the United States Army is going to need a lot more drones.*

132.   Also on the SRR Contract Conference Call, Defendants Stewart and

Thompson conveyed their confidence that Red Cat could generate between $50 million and $79.5 million in revenue from the SRR Contract during the Company's fiscal year 2025 alone, stating:

> [Defendant Stewart:] Right now, in the National Defense Authorization Act, we're sitting at a [*sic*] approximate program line value . . . ***that supports SRR of $79.5 million***. Now that is a – that number is not final. The NDAA is still not passed and won't be for about 60 days. But we feel very confident that through this support, we'll be able to expand this program going into the future.
>
> ***
>
> [Defendant Thompson: W]e gave guidance of $50 million to $55 million for calendar 2025 . . . . And if you add the number that Brendan was talking about . . . for 2025, which is that ***$79 million that could possibly put the calendar year on $120 million for next year***. So, that's pretty exciting. And that would just be the army . . . . [W]e're trying to figure out that line item that [Defendant Stewart] talked about is ***up to $79 million for the – for 2025*** . . . . [W]e're supposed to be making the first deliveries in late spring, and we only have till the end of September to deliver on 2025 calendar. ***So, it could be up to $79 million.*** Once we have more clarity, ***we think it's easily going to be in the close to $50 million anyway for 2025 calendar***. So, guidance will probably and this isn't official guidance yet. But again, we just got this notification and we think ***it'll be approximately $50 million from SRR and other things that will add to that*** as other branches of the Army piles on there.

133. In addition, during the SRR Contract Conference Call, Defendants Thompson and Hitchcock indicated that Red Cat could potentially realize an additional 30% to 70% in revenue from the SRR Contract through supplemental services, stating, in relevant part:

> [Defendants Thompson: H]ow these programs of records [like the SRR Program] work [is] that ***they typically have anywhere from 30% to 65%, 70% sometimes of additional revenue from training, spares and repairs***."
>
> ***
>
> [Defendant Hitchcock: T]ypically, year-over-year, ***you could expect somewhere in the range of 30% added for spares, repairs and training year-***

*over-year*."

134.  The statements referenced in ¶¶88-98, 103-104, 113-116, and 130-133 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

135.  The truth fully emerged on January 16, 2025, during intraday trading hours, when Kerrisdale published a report alleging, among other things, that Red Cat had overstated the value of the SRR Contract and lacked the production capacity to fulfill its commitments. The Kerrisdale Report reported, in relevant part:

> **<u>The SRR contract that Red Cat won in November and preemptively announced without the Army's permission is much smaller and less favorable than management has intimated.</u>** Red Cat management has spent years hyping the potential of Tranche 2 of the Army's [SRR sUAS] program for which the company was competing. Investors were initially led to believe that the revenue potential of a win would be in the billion dollar range over the course of 5-10 years. Upon winning the contract, management curbed those expectations by quite a bit, though *still* signaled revenue of $260 million for 5,880 drone systems over the next five years, plus about 30% of that sticker price to be earned in repairs, replacements, and training services. Management called out $80 million in 2025 expected revenue, specifically citing the National Defense Authorization Act (NDAA) text.
>
> But the NDAA says nothing about the SRR funding in particular and the Army's detailed funding request for 2025 shows that the service expects to procure between 275 and 300 systems annually at a cost of $20-25 million, which is a very far cry from Red Cat's 2025 SRR guidance. Additionally, the cost for repairs, replacements, and related services are *included* in that $20-25 million, so Red Cat's "plus 30%" should be entirely discounted.

(Emphasis in original).

136.    The Kerrisdale Report further reported that Red Cat had jeopardized the overall value of the SRR Contract by publicly announcing the award of the contract without obtaining prior authorization from the U.S. Army, stating, in relevant part:

> We also discovered in the course of our diligence that Red Cat's November announcement of the SRR contract win was made improperly without the Army's approval. While that's unlikely to scuttle the contract win completely, our sources indicated that it might make negotiating the precise contract terms with the Army contentious and more difficult for Red Cat. It may also result in the Army more strictly enforcing contract terms and more willing to contemplate other suppliers if and when the opportunity presents itself.

137.    Additionally, the Kerrisdale Report scrutinized the timing of executive departures and insider transactions that occurred shortly after the announcement of the SRR Contract, stating, in pertinent part:

> **Teal's wunderkind founder and brains behind the SRR, [Defendant] Matus, resigned just a week after the SRR announcement, with [Defendant] Lunger resigning just 3 weeks later.**
>
> ***
>
> Six days after Red Cat announced the SRR award, [Defendant] Matus gave 30 days' notice of his resignation. Between December 20th and December 27th, he sold about 800,000 shares at an average price of $11.75. Just a few days after his resignation, [Defendant] Matus announced he was co-founding a new company dedicated to addressing weaknesses in the defense procurement ecosystem, which suggests that his resignation was a long time in coming. That seems to us like a harsh repudiation of Red Cat and its management team, and a vote of no-confidence in the ability of the company to achieve what management says it will.
>
> [Defendant] Matus wasn't the only one at Red Cat lacking conviction. [Defendant] Lunger announced on the mid-December earnings call that she was resigning for family reasons and sold half a million shares – about 60% of her holdings – for $9.52 on December 20th. Other directors and insiders – including [Defendant] Thompson! – have sold a total of 1.6 million shares for over $16 million just since December 20th.

(Emphasis in original).

138. The Kerrisdale Report also reported that Red Cat has continued to misrepresent the production capacity of its Salt Lake City Facility to the public, stating, in relevant part:

> Over the last 3 years, Red Cat has promised investors *multiple times* that within some clearly definable near-term deadline it will be capable of producing "thousands of drones" per month. First it was "by the fall" in early 2022, then it was "in a few months" in November of 2022, then "now" in March of 2023, then "in a few months" in July of that year, then "now" (again) in early 2024, and most recently (in September) it was to be at some point in 2025 . . . . *[D]rone industry sources close to the company don't think Red Cat has the manufacturing capability for mass production of drones.* Getting there would take time and a real capital expenditure commitment.
>
> ***
>
> In the course of our due diligence, *we found a drone industry specialist who's been following Teal since its founding by [Defendant] Matus* and who had the utmost admiration for what he's accomplished. *They were adamant that there's just no way that Teal is capable of any sort of mass production* . . . . Red Cat's financials seem to confirm this assessment: *Over the 3 years ending on October 31, the company has spent a mere $3.1 million on capital expenditures, with over two thirds of that before the end of 2022. It's highly implausible that a mass-production facility for manufacturing drones has been built at any point in the last two years for less than $1 million.*

139. On this news, the price per share of the Company's stock fell $2.35, or approximately 21.54%, over the following two trading sessions, from a closing price of $10.91 per share on January 15, 2025 to close at $8.56 per share on January 17, 2025.

## DAMAGES TO RED CAT

140. As a direct and proximate result of the Individual Defendants' conduct, Red Cat has lost and expended, and will continue to lose and expend, many millions of dollars.

141. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

142.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

143.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

144.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

145.   As a direct and proximate result of the Individual Defendants' conduct, Red Cat has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## **DERIVATIVE ALLEGATIONS**

146.   Plaintiff brings this action derivatively and for the benefit of Red Cat to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Red Cat, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

147.   Red Cat is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.   Plaintiff is, and has been at all relevant times, a shareholder of Red Cat. Plaintiff will adequately and fairly represent the interests of Red Cat in enforcing and

prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

<b><u>DEMAND FUTILITY ALLEGATIONS</u></b>

149.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

150.   A pre-suit demand on the Board of Red Cat is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five individuals: Defendants Thompson, Freedman, Liuzza, and Moe (the "Director-Defendants"), and non-party Funk (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

151.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

152.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Red Cat to issue materially false and misleading statements. Specifically, the Director-Defendants caused Red Cat to issue false and misleading statements which were intended to make Red Cat appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

153.   Moreover, the Director-Defendants solicited the 2023 Proxy Statement, which called for shareholders to vote to, *inter alia*, re-elect Defendants Thompson, Freedman,

Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

154.   In addition, the Director-Defendants caused the 2023 Proxy Statement to call for a shareholder vote to approve the Amendment, which made shares available to employees and directors of the Company. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Amendment, who would not have approved the Amendment, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the Amendment at the annual meeting of stockholders on November 6, 2023, there were 8,750,000 shares available under the then-existing plan. After the shareholders approved the Amendment, 3,000,000 additional shares were made available under the plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits they otherwise would not receive but for the issuance of the false and misleading 2023 Proxy Statement and the shareholders approving the Amendment pursuant to the 2023 Proxy Statement. As such, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

155.   Moreover, the Director-Defendants solicited the 2024 Proxy Statement, which called for shareholder votes to, *inter alia*, re-elect Defendants Thompson, Freedman, Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

156.   Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as the Company's CEO, President, and as a Company director since May 2019. As such, the Company provides Defendant Thompson with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Thompson was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period. In addition, as the Company's highest officer, he

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also signed and made SOX certifications for the false and misleading FY22 10-K, FY23 10-K, FY24 10-K and solicited the false and misleading 2023 and 2024 Proxy Statements, which resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amendment and the 2024 Incentive Plan, thereby allowing the Director-Defendants to materially benefit therefrom in the future.. Moreover, Defendant Thompson is named as a defendant in the Securities Class Action and has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $5.7 million.  For these reasons, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Freedman is futile follow. Defendant Freedman has served as a Company director since January 2021. He also serves as the Lead Independent Director, Chairman of the Board, and as a member of the Nominating and Governance Committee and Audit Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading FY22 10-K, FY23 10-K, and FY24 10-K and solicited the false and misleading 2023 and 2024 Proxy Statements, which resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the

Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amendment and the 2024 Incentive Plan, thereby allowing the Director-Defendants to materially benefit therefrom in the future.. Moreover, Defendant Freedman has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $5.7 million. For these reasons, Defendant Freedman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158. Additional reasons that demand on Defendant Liuzza is futile follow. Defendant Liuzza has served as a Company director since June 2019. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading FY22 10-K, FY23 10-K, and FY24 10-K and solicited the false and misleading 2023 and 2024 Proxy Statements, which resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amendment and the 2024 Incentive Plan, thereby allowing the Director-Defendants to materially benefit therefrom in the future. Moreover, Defendant Liuzza has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds of approximately $3.5

million. For these reasons, Defendant Liuzza breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159. Additional reasons that demand on Defendant Moe is futile follow. Defendant Moe has served as a Company director since February 2022. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Nominating and Governance Committee. He receives handsome compensation for his role at the Company. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he signed the false and misleading FY22 10-K, FY23 10-K, and FY24 10-K and solicited the false and misleading 2023 and 2024 Proxy Statements, which resulted in, *inter alia*, shareholders voting to: (1) re-elect several of the Director-Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amendment and the 2024 Incentive Plan, thereby allowing the Director-Defendants to materially benefit therefrom in the future. For these reasons, Defendant Moe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on the Board is futile follow.

161. Defendants Moe (as Chair), Freedman, and Liuzza (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate

the Individual Defendants' violations of law and breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

162.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

163.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

164.    The acts complained of herein constitute violations of fiduciary duties owed by Red Cat's officers and directors, and these acts are incapable of ratification.

165.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Red Cat. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Red Cat, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

166.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Red Cat to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

167.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a) of the Securities and Exchange Act of 1934

168.   Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though full set-forth herein.

169.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

170.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

171.    Under the direction and watch of Defendants Thompson, Freedman, Liuzza, and Moe, the 2023 and 2024 Proxy Statements failed to disclose that (1) although the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

172.    The 2023 and 2024 Proxy Statements also failed to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the Company's public statements were materially

false and misleading and/or lacked a reasonable basis at all relevant times.

173.   Defendants Thompson, Freedman, Liuzza, and Moe knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements, including but not limited to, the re-election of directors and approval of material incentive award programs.

174.   In the exercise of reasonable care, Defendants Thompson, Freedman, Liuzza, and Moe should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading.

175.   As a result of the material misstatements and omissions contained in the 2023 and 2024 Proxy Statements, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Thompson, Freedman, Liuzza, and Moe to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) approve the Amendment and the 2024 Incentive Plan, thereby allowing the Individual Defendants to materially benefit thereunder in the future.

176.   The Company was damaged as a result of Defendants Thompson's, Freedman's, Liuzza's, and Moe's material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

177.   Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

178.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.   Each Individual Defendant owed to the Company the duty to exercise candor,

good faith, and loyalty in the management and administration of Red Cat's business and affairs.

180.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

181.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Red Cat.

182.   In breach of their fiduciary duties owed to Red Cat, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the production capacity of the Salt Lake City Facility, as well as the progress made in its development, was overstated; and (2) the potential value of the SRR Contract was exaggerated. As a result of the foregoing, the statements made were materially false and misleading and/or lacked a reasonable basis at all relevant times.

183.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

184.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

185.   Moreover, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements alleged herein, reaping combined total proceeds of approximately $25.1 million.

186.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the

Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Red Cat's securities.

187.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Red Cat's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

188.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

189.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Red Cat has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

192.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Red Cat.

193.   The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Red Cat that was tied to the performance or artificially inflated valuation of Red Cat, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

194.   Plaintiff, as a shareholder and a representative of Red Cat, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

195.   Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

196.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

198.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Red Cat to waste valuable corporate assets, to incur many millions of dollars of legal liability

and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

199.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.   Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

201.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Red Cat in a manner consistent with the operations of a publicly held corporation.

203.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Red Cat has sustained and will continue to sustain significant damages.

204.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

205.   Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Abuse of Control

206.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Red Cat, for which they are legally responsible.

208.   As a direct and proximate result of the Individual Defendants' abuse of

control, Red Cat has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff, on behalf of Red Cat, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart for Contribution Under Sections 10(b) and 21D of the Exchange Act**

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    Red Cat and Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Thompson's, Lunger's, Hernon's, Matus', Hitchcock's, and Stewart's willful and/or reckless violations of their obligations as officers and/or directors of Red Cat.

212.    Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart, because of their positions of control and authority as officers and/or directors of Red Cat, were able to and did, directly or indirectly, exercise control over the business and corporate affairs of Red Cat, including the wrongful acts complained of herein and in the Securities Class Action.

213.    Accordingly, Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

214.    As such, Red Cat is entitled to receive all appropriate contribution or

indemnification from Defendants Thompson, Lunger, Hernon, Matus, Hitchcock, and Stewart.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Red Cat, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Red Cat;

(c)    Determining and awarding to Red Cat the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Red Cat and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Red Cat and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Red Cat to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Red Cat restitution from the Individual Defendants, and each

of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 11, 2025                          Respectfully submitted,

Of Counsel:

**THE BROWN LAW FIRM, P.C.**                    **LEVERTY & ASSOCIATES LAW CHTD.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017                              _/s/ Patrick Leverty_____
Telephone: 516. 922.5427                        Patrick R. Leverty
Facsimile: 516.344.6204                         832 Willow Street
Email: tbrown@thebrownlawfirm.net               Reno, NV 89502
                                                Tel. 775.322.6636
                                                Fax. 775.322.3953
                                                Email: pat@levertylaw.com

                                                *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Patrick Fuchs, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8 __ day of August, 2025.

Signed by:

Patrick Fuchs